NOT FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

|  |  |  |
|---|---|---|
| JOHN B. FULLAWAY, | : | |
| Plaintiff, | : | Civil No. 06-5771 (RBK) |
| v. | : | **OPINION** |
| MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY, | : | |
| Defendant. | : | |

**KUGLER**, United States District Judge:

This matter comes before the Court upon appeal by Plaintiff John B. Fullaway ("Fullaway" or "Claimant"), pursuant to 42 U.S.C. § 405(g), for review of a final determination of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits ("DIB"). For the reasons set forth below, the Court must remand this case for further development of the record before the ALJ.

**I.     BACKGROUND**

Fullaway alleges that he is disabled with an onset date of January 15, 1989. He alleges that his disability arises from injuries sustained during the Vietnam War, including irritable bowel syndrome, nausea, vomiting, dizziness, stomach cramping, and post traumatic stress disorder.

1

Fullaway served in the U.S. Army from September 27, 1965 to March 13, 1969. (R. at 120.) While in combat during the Vietnam War, Fullaway was shot in the abdomen and the right thigh. (R. at 100.) Multiple surgeries were required, in which Fullaway had parts of his bowel resected and underwent a colostomy. (R. at 100.) Prior to 1989, Fullaway's main stomach symptom was irritable bowel syndrom manifested by diarrhea with near urge incontinence. (R. at 158.) In 1989, Fullaway suffered GI tract bleeding and was diagnosed with a bleeding ulcer. (R. at 158.) As a result, Fullaway underwent several surgeries, including a vagotomy, gastrectomy, and repair of an anastomotic site. (R. at 130-39.) During this period Fullaway suffered from nausea and bowel movement difficulties, as well as loss of strength, endurance and weight. (R. at 142.)

In February 2004, the Veterans Administration ("VA") conducted a PTSD evaluation and diagnosed Fullaway with post traumatic stress disorder as a result of his service in Vietnam and noted evidence of alcohol abuse. (R. at 152-57.) A subsequent muscle exam also noted irritable bowel syndrome. (R. at 159.) At this time, Fullaway's disabled status, according to the VA, was 80%, with a 60% disability for postoperative stomach injury, 30% for abdominal muscle damage, 30% for thigh muscle damage, 10% for back muscle impairment and 0% for scars. (R. at 152.)

In March 2004, Fullaway was evaluated by the VA for depression. (R. at 259.) His chief complaint was depression for the previous six months and trouble sleeping. (R. at 262.) He informed the VA of night sweats, interrupted sleep, and worsening depression as a result of the attacks on the United States on September 11, 2001. (R. at 264.) Fullaway denied any physical problems but stated that he was using vodka and marijuana to get relief from his depression. (R. at 259.) Specifically, Fullaway was drinking a half-pint of vodka and a few beers per day. (R. at

264.) He was diagnosed with alcohol dependence, alcohol withdrawal, depression, tobacco use disorder, and post traumatic stress disorder. (R. at 259-68.)

On June 17, 2004, the VA determined that effective October 20, 2003, the claimant was 70% disabled due to post traumatic stress disorder. (R. at 117.) His overall or combined rating established him to be 100% disabled. (R. at 117.)

In April 2005, Fullaway underwent outpatient alcohol detoxification. (R. at 278.) He started on the medication Serax, which was later supplemented by the drugs Paxil and Remeron. (R. at 279.) A VA progress note on May 18, 2005 indicated that Fullaway had only become an alcoholic within the past three years. (R. at 290.) Fullaway indicated that he had consumed a lot of alcohol in the few weeks previously, had tried to stop on his own, would be fine for six weeks or two months, but would then go back to drinking. (R. at 290.) On May 23, 2005 a progress note indicated that Fullaway believed Paxil to be helping him a lot. (R. at 292.) On June 24, 2005, Fullaway noted that "things are going well," as he was sleeping better and denied any alcohol use. (R. at 216.) In August 2005, he reported attending Alcoholics Anonymous meetings and felt good about his sobriety. (R. at 212.) On August 23, 2004, Fullaway stated that he believed his PTSD to be well managed and reported no longer using drugs or alcohol. (R. at 274.) His GAF on that date was reported at 50. (R. at 274.) In October 2005, Fullaway reported attending outpatient groups and stated that he was doing "pretty good" and "I don't even think of drinking anymore." (R. at 207-08.)

At the hearing before ALJ Shellhamer on February 13, 2006, Fullaway testified that he had been wounded in Vietnam. (R. at 323-24.) As a result he experienced diarrhea, had three to five bowel movements per day, had to take frequent restroom breaks, and had difficulty

maintaining his weight. (R. at 324.) He discussed how in 1989, he became ill with a bleeding ulcer and underwent three surgeries. (R. at 329.) Fullaway testified that he had dizzy spells, nausea, stomach cramps after meals, and had lost weight. (R. at 330.) In 1991, he developed a leakage in the stomach and underwent another operation. (R. at 329.) Fullaway testified that he had six hours of downtime each day, and had to eat three to five small meals per day. (R. at 333-34.) He testified that he had not been hospitalized or taken any medications for his stomach condition since the operation in 1991. (R. at 331-32.)

Fullaway further testified that in 2004 he filed an application with the VA seeking disability based upon his post traumatic stress disorder. (R. at 334.) He experienced survivors' guilt, preoccupation with Vietnam, and nightmares about returning to Vietnam. (R. at 334-37.) The September 11th terrorist attacks greatly affected him and worsened his symptoms. (R. at 337.) Fullaway stated that he began drinking heavily, and eventually he went to the VA for substance abuse treatment and received group therapy for post traumatic stress disorder. (R. at 337-38.) Fullaway testified that he had been clean since April 2005. (R. at 338.)

On October 22, 2003, Fullaway filed an application for a Period of Disability and Disability Insurance Benefits alleging disability as of January 15, 1989. (R. at 53-55.) The application was denied initially on July 14, 2004 (R. at 26.) and on reconsideration on November 9, 2004. (R. at 32.). On December 22, 2004, Fullaway filed a timely written request for a hearing (R. at 35), which was held on February 13, 2006 by Administrative Law Judge Daniel N. Shellhammer ("ALJ Shellhammer"). Fullaway testified at the hearing, as did vocational expert Ted C. Mantegna.

ALJ Shellhammer issued an opinion on March 30, 2006 denying Fullaway's claim. (R. at

4

13-21.)  Fullaway filed a request for review on June 2, 2006.  (R. at 9.)  The Appeals Council denied Fullaway's request on September 29, 2006, and ALJ Shellhamer's decision became the final decision of the Commissioner.  (R. at 3-5.)  Fagan filed this action seeking review of the decision on December 1, 2006.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

## II.     STANDARD OF REVIEW

District Court review of the Commissioner's final decision is limited to ascertaining whether the decision is supported by substantial evidence.  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Morales v. Apfel, 225 F.3d 310, 316 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 422 (3d Cir. 1999)).  If the Commissioner's determination is supported by substantial evidence, the Court may not set aside the decision, even if the Court "would have decided the factual inquiry differently."  Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) (citing Hartranft, 181 F.3d 358, 360 (3d Cir. 1999)); see also Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984) ("A district court may not weigh the evidence or substitute its conclusions for those of the fact-finder.").

Nevertheless, the reviewing court must be wary of treating "the existence vel non of substantial evidence as merely a quantitative exercise" or as "a talismanic or self-executing formula for adjudication."  Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.").  The Court must

set aside the Commissioner's decision if the Commissioner did not take into account the entire record or failed to resolve an evidentiary conflict. Schonewolf v. Callahan, 972 F. Supp. 277, 284-85 (D.N.J. 1997) (citing Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978)) ("[U]nless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."). Furthermore, evidence is not substantial if "it constitutes not evidence but mere conclusion," or if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." Wallace v. Secretary of Health and Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (citing Kent, 710 F.2d 110, 114 (3d Cir. 1983)).

### III. DISCUSSION

#### A. ALJ Shellhammer's Decision

The Commissioner conducts a five step inquiry to determine whether a claimant is disabled. 20 C.F.R. § 404.1520; Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). The Commissioner first evaluates whether the claimant is currently engaging in a "substantial gainful activity." Such activity bars the receipt of benefits. 20 C.F.R. § 404.1520(a). The Commissioner then ascertains whether the claimant is suffering from a severe impairment, meaning "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the Commissioner finds that the claimant's condition is severe, the Commissioner determines whether it meets or equals a listed impairment. 20 C.F.R. § 404.1520(d). If the condition is

equivalent to a listed impairment, the claimant is entitled to benefits; if not, the Commissioner continues to step four to evaluate the claimant's residual functional capacity ("RFC") and to analyze whether the RFC would entitle the claimant to return to her "past relevant work." 20 C.F.R. § 404.1520(e). The ability to return to past relevant work precludes a finding of disability. If the Commissioner finds the claimant unable to resume past relevant work, the burden shifts to the Commissioner to demonstrate the claimant's capacity to perform work available "in significant numbers in the national economy." Jones, 364 F.3d at 503 (citing 20 C.F.R. § 404.1520(f)).

  Before applying the five-step process, ALJ Shellhammer first concluded that Fullway last met the insured status requirements of the Social Security Act on September 30, 1994. (R. at 15.) This means that Fullway was required to prove an inability to work beginning on or prior to September 30, 1994 and continuing for an uninterrupted period to within at least fourteen months of the date of his application for benefits on October 22, 2003. The ALJ next concluded that Fullaway had not engaged in substantial gainful activity at any time since the alleged onset of disability on January 15, 1989. He concluded that through September 30, 1994, Fullaway suffered from residual effects of a bowel resection and post traumatic stress disorder, both of which the ALJ determined to be severe impairments. (R. at 16.) However, ALJ Shellhammer determined that these impairments did not meet the requirements of any listed impairments on or before September 30, 1994, specifically referencing the listings in Section 5.00 (digestive system) and Section 12.00 (mental disorders.) (R. at 16-17.) The ALJ next determined that through September 30, 1994, Fullaway had the residual functional capacity to perform a wide range of light or sedentary-level exertional work, determining that Fullaway could lift and carry

up to twenty pounds occasionally and ten pounds frequently, could stand and/or walk for up to about six hours, and could sit for about six hours in an eight-hour workday.  ALJ Shellhammer modified the requirements of light or sedentary-work somewhat by adding the limitation that Fullaway required to be near a restroom at all times and be able to take occasional unscheduled restroom breaks.  (R. at 17-19.)  Based on this conclusion as to Fullaway's RFC, the ALJ determined that Fullaway could not return to his past relevant work, classified as an unskilled position requiring a medium level of exertion.  (R. at 19.)  He concluded that Fullaway's additional non-exertional limitations did not substantially impede Fullaway's ability to perform the requirements of light or sedentary work.  (R. at 20.)  He then consulted the Medical-Vocational Guidelines ("the grids") and concluded that Fullaway's RFC, combined with his status as a "younger individual" on the date last insured, directed a finding of "not disabled."  (R. at 20.)

Fullaway assigns error to the ALJ's conclusions on several issues.  First, Fullaway contends that the ALJ's conclusion regarding his RFC was flawed because it did not include appropriate consideration of his non-exertional limitations, including his need to be near a restroom at all times and to be able to take occasional unscheduled restroom breaks.  (Pl.'s Br. at 9.)  He argues that the testimony of a vocational expert regarding the occupational effect of the non-exertional limitations was necessary.  (Pl.'s Br. at 10, 12.)  Fullaway additionally argues that the ALJ erred in not taking other non-exertional limitations into account in the RFC determination, such as his dizzy spells, nausea, stomach cramps, and lightheadedness, in addition to his severe mental impairment.  (Pl.'s Br. at 12, 15-17.)  Finally, Fullaway argues that it was error to not credit his subjective complaints and to find his testimony not credible.  (Pl.'s Br. at

17-19.)

### B.     Consideration of Non-Exertional Limitations

ALJ Shellhammer concluded that Fullaway had the residual functional capacity to perform a full or wide range of light or sedentary work. (R. at 17.) However, he did note two non-exertional limitations to be taken into account. These non-exertional limitations were based on Fullaway's need to be near a restroom at all times and the need to take occasional unscheduled restroom breaks because of frequent bowel movements. (R. at 17.) ALJ Shellhammer then concluded that Fullaway's non-exertional limitations were relatively minor and would not significantly erode the job base of either light or sedentary work. (R. at 17.)

In forming this conclusion as to the effect of Fullaway's non-exertional limitations on his ability to work, ALJ Shellhammer referenced three Social Security Rulings ("SSRs"). SSRs are agency rulings published under the authority of the Commissioner of Social Security, and they can be relied on as precedents in other applicable cases. 20 C.F.R. § 402.35(b)(1); Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984). The ALJ referenced SSR 83-10, SSR 83-14, and SSR 96-9p. (R. at 20.) In doing so, he noted that "sedentary jobs, in particular, generally do not require frequent and strenuous physical activities and are often performed indoors in controlled environments with ready access to restroom facilities." (R. at 17.)

When evaluating a claimant with solely exertional limitations, an ALJ is permitted to rely on the medical-vocational grids to establish the existence of a significant number of jobs in the national economy. Heckler v. Campbell, 461 U.S. 458, 467 (1983). However, if an individual has non-exertional limitations, the ALJ cannot rely solely on the grids and is required to determine if the non-exertional impairments significantly erode the claimant's occupational base.

Sykes v. Apfel, 228 F.3d 259, 269 (3d Cir. 2000).  In making this determination about the effect of the non-exertional limitations on the claimant's ability to work, an ALJ is permitted to rely on an SSR or other rulemaking by the Social Security Commission.  Allen v. Barnhart, 417 F.3d 396, 406 (3d Cir. 2005).  In other words, the testimony of a vocational expert on the impact of non-exertional limitations is not always required.  However, this substitution of reliance on a Rule for an individualized determination as to the impact of those limitations is only permissible where there is a "'fit' between the facts of a given case, namely the specific nonexertional limitations, and the way in which the Rule dictates that such nononexertional limitations impact the base."  Id.

The SSRs cited by ALJ Shellhammer fail to establish any "fit."  SSR 96-9p offers guidelines for evaluating the potential erosion of the occupational base when a claimant has limitations (both exertional and non-exertional) that limit him to less than a full range of sedentary work.  Some of the specific non-exertional limitations whose impacts are discussed in SSR 96-9p include postural limitations such as an inability to stoop or crouch, manipulative limitations such inability to pick up or handle small objects, visual limitations such as an inability to see small objects, environmental restrictions such as an inability to work in extreme temperatures or with allergens, and mental limitations such as inability to make judgments or follow directions.

SSR 83-10 discusses the requirements for each exertional level and notes that an individual must be able to perform all or substantially all of the requirements of a particular exertional level in order to have an RFC indicating the ability to work at that level.  The SSR also discusses how to evaluate the effect of non-exertional limitations.  Some of the non-exertional

limitations discussed include maintaining body equilibrium, mental impairments, and environmental demands.

SSR 83-14 also discusses the effects of non-exertional limitations on a claimant's occupational base. It provides an example of where a non-exertional limitation will not significantly erode a claimant's occupational base at the sedentary level.

> An example of nonexertional impairment which ordinarily has an insignificant effect on a person's ability to work is an allergy to ragweed pollen. Many individuals who have this allergy experience no more discomfort during the ragweed season than someone who has a common cold. However, others are more affected by the condition. Assuming that an individual has a severe impairment of the low back which limits that person to sedentary work, and that the assessment of RFC also restricts him or her from workplaces which involve exposure to ragweed pollen, the implications for adjustment to sedentary work are relatively clear. Ragweed grows outdoors and its pollen is carried in the air, but the overwhelming majority of sedentary jobs are performed indoors. Therefore, with the possible exclusion of some outdoor sedentary occupations which would require exposure to ragweed pollen, the unskilled sedentary occupational base is not significantly compromised. The decisionmaker may need the assistance of a VS in determining the significance of the remaining occupational base of unskilled sedentary work in more difficult cases.

SSR 83-14's examples of non-exertional limitations with no significant impact on a claimant's occupational base include "inability to ascend or descend scaffolding, poles, and ropes; inability to crawl on hands and knees; and inability to use the finger tips to sense the temperature or texture of an object. Environmental restrictions, such as the need to avoid exposure to feathers, would also not significantly affect the potential unskilled light occupational base."

Fullaway's non-exertional limitations, according to ALJ Shellhammer, require him to be near a bathroom at all times and to be able to take "occasional unscheduled restroom breaks due to frequent bowel movements." (R. at 17.) While the Rules do support the ALJ's conclusion

that most sedentary work is performed indoors, they cannot support the rest of his conclusions regarding the impact of Fullaway's limitations. None of these rules reference any limitations involving the need to take "occasional unscheduled breaks." The most similar references are found in the definition of sedentary work, which the SSRs note requires an individual to "remain in a seated position for approximately 6 hours of an 8-hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals."

The Third Circuit has given explicit directions regarding evaluating the impact of non-exertional limitations: "[I]f the Secretary wishes to rely on an SSR as a replacement for a vocational expert, it must be crystal-clear that the SSR is probative as to the way in which the nonexertional limitations impact the ability to work, and thus, the occupational base." Allen, 417 F.3d at 407. See, e.g., Poulos v. Comm'r of Social Sec., 474 F.3d 88, 93-95 (3d Cir. 2007); Meyler v. Comm'r of Social Sec., 238 F. App'x 884, 890-91 (3d Cir. 2007). Moreover, if the ALJ plans to rely on an SSR rather than make an individualized determination based on the testimony of a vocational expert, the ALJ ought to give the claimant notice of this. Allen, 417 F.3d at 407-8.

ALJ Shellhammer's conclusion that sedentary jobs, because they are performed indoors, are likely to have "ready access to restroom facilities" may be matter of common sense. However, his conclusion regarding the minor impact of Fullaway's need to take unscheduled restroom breaks, which Fullaway testified could occur three to four times per day and last for up to half an hour, is not supported. (R. at 326-28.) Nothing in the SSRs or elsewhere in the record supports the conclusion that such a limitation would not significantly erode the occupational base of jobs Fullaway had the capacity to perform.

12

The direction to take vocational testimony or establish a fit between the non-exertional limitations and an SSR is not limited to the mental limitations that were the subject of the ruling in Allen.  In Poulos, the claimant suffered from obesity, and the ALJ found that he had several resulting non-exertional limitations, including an inability to shift rapidly between positions or locations and limitations in the use of certain chairs.  Poulos, 474 F.2d at 94.  The ALJ determined that these non-exertional limitations did not significantly erode the claimant's occupational base with reference to SSR 83-10 and 85-15 but without consulting a vocational expert.  The ALJ noted that "study chairs are typically readily available in settings where sedentary work is done."  Id.  The Third Circuit reversed and remanded, holding that the ALJ's conclusions were not supported by substantial evidence in the record.  Id.  The Third Circuit noted, "So far as we can see from the record, the ALJ's conclusion is based solely on his own opinion.  This lack of supporting evidence highlights why we require an ALJ either to take vocational evidence or to follow the proper steps to take official notice."  Id. at 94-95.

There was a vocational expert present at Fullaway's hearing, but he was not asked about the impact of Fullaway's non-exertional limitations.  He merely testified that Fullaway's past work was at the medium-unskilled level.  (R. at 339-40.)  When Fullaway's counsel asked him a hypothetical question about the impact of requiring three hours of "down time" during an eight-hour work day, the vocational expert agreed that such a limitation would preclude all work.  (R. at 341-41.)  There was no vocational evidence regarding the need to work in close proximity to a restroom and take occasional unscheduled breaks.  The ALJ's conclusion that these limitations did not significantly erode Fullaway's occupational base is not supported by substantial evidence.

### C.     Other Challenges

Because this case must be remanded for further development of the record before the ALJ, the Court will not reach Fullaway's other challenges to the ALJ's decision.

## IV.    CONCLUSION

Because ALJ Shellhammer did not properly consider the effect of Fullaway's non-exertional limitations on his ability to work as of the date he was last insured for disability insurance benefits, the Court must vacate the ALJ's opinion and remand this case for further proceedings.

Dated:  March 28, 2008                              /s/ Robert B. Kugler
                                                    ROBERT B. KUGLER
                                                    United States District Judge